UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

GERALD A. GUNNER,

        Debtor.

_____/

Case No. 10-72972
Chapter 7
Hon. Walter Shapero

GENERAL MOTORS, LLC,

        Plaintiff,

v.

GERALD A. GUNNER,

        Defendant.

_____/

Adv. Pro. No. 10-07685

# OPINION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

## INTRODUCTION

Plaintiff commenced a multiple count nondischargeability action under 11 U.S.C. §§ 523(a)(2), (a)(4), (a)(6) and § 727(a)(2) stemming from several overpayments it made to a business owned and operated by Defendant. Before the Court is Defendant's motion for summary judgment as to all counts. The motion is granted in part and denied in part.

## FACTS

Gerald A. Gunner ("Gunner") was the majority owner and president of Jonner Steel Industries, Inc. ("Jonner Steel"). Jonner Steel frequently, but not regularly, sold steel products to General Motors, LLC ("GM") or its predecessor. The relationship between GM and Jonner Steel

1

began around 2003. As a matter of ordinary practice, GM would seek a bid from Jonner Steel, which would then send a price quote and deliver the goods, together with an invoice and bill of lading. Jonner Steel would bill on the basis of pounds, not kilograms (apparently because its computer system was only equipped to calculate based on pounds). GM, on the other hand, apparently had a regular practice of asking or requiring its steel suppliers to bill in kilograms. However, Jonner Steel invariably billed GM in pounds but billed for the correct dollar amount. GM, while obviously aware of Jonner Steel's practice of billing in pounds, never requested that Jonner Steel alter its billing methods. The parties had transacted business pursuant to this arrangement without incident and GM paid Jonner Steel the correct amounts due.

Around April 2004, GM changed its payment processing company to a firm located in Jamaica. Between April 2004 and March 2005, Jonner Steel continued its prior billing practice of sending GM invoices denominated in pounds and still accurate in terms of dollars. However, GM began taking that per-pound dollar figure and recalculating it based on the per-kilogram price, with the effect that, while Jonner Steel would bill for a certain correct dollar amount, GM would make a needless conversion to kilograms that resulted in payments to Jonner Steel of much higher amounts than the amounts Jonner Steel billed. GM made eight such overpayments before becoming aware of its errors, allegedly after receiving an anonymous "whistleblower memorandum" from an employee of Jonner Steel, which indicated that Jonner Steel's management was aware of the overpayments and accepted the benefits without alerting GM. After ceasing the overpayments, GM was later able to recoup some of the sums by applying credits to subsequent purchases from Jonner Steel.

Jonner Steel did not receive the payments from GM directly. Rather, it had a "lockbox arrangement" with its lender Bank of America, whereby Bank of America would initially receive the payment and apply it to the balance of Jonner Steel's loan. Whenever GM remitted payment to Jonner Steel via the lockbox, Jonner Steel would be notified of such within about 48 hours. Jonner Steel had been experiencing financial difficulties as early as 2002 and ceased operating in August 2006. There is no factual dispute that GM made overpayments to Jonner Steel and that GM was able to recoup only a portion of such by way of set-offs or other remedies.

GM filed suit for the overpayments in the Circuit Court of Wayne County, Michigan ("State Court") against both Gunner and Jonner Steel on four theories: conversion, fraud, unjust enrichment, and constructive trust. The parties engaged in extensive discovery. On December 3, 2008, the state court held a hearing on the parties' cross-motions for summary judgment, at the conclusion of which the Judge ruled from the bench (a) granting GM's motion for summary judgment on the basis of conversion, jointly and severally against Gunner and Jonner Steel; and (b) granting Gunner and Jonner Steel's motion on the other three counts. In doing so, the State Court rejected Gunner's purported defense that the lockbox arrangement made it impossible to repay GM for the overpayments and it stressed the level of control that Gunner had over the operations and management of Jonner Steel, indicating that it found Gunner personally liable mostly because of the testimony of Dawn Heythaler (Gunner's girlfriend and an employee of Jonner Steel whose duties included managing invoices and inventory) that Gunner had the authority to instruct Heythaler to issue GM a check for its overpayments if he chose to do so. The State Court issued a subsequent order regarding the amount of damages and entered a final judgment on March 12, 2010, awarding GM $358,152.23 (representing the principal sum of the

3

overpayments, less any set-offs) but denying GM's request for treble damages under Mich. Comp. Laws 600.2919a. Gunner did not appeal this ruling. GM thereafter pursued collection by garnishing Gunner's wages and placing a judgment lien on his home.

Gunner subsequently filed the present Chapter 7 bankruptcy on October 28, 2010, reflecting the judgment debt to GM on his schedules. Thereafter, GM filed this multiple count nondischargeability action. GM moved for summary judgment on the theory that the State Court judgment finding Gunner liable for conversion should be granted collateral estoppel effect under § 523(a)(6) for willful and malicious injury. This Court denied GM's motion, essentially because the State Court's judgment did not actually and necessarily litigate any willfulness or maliciousness on Gunner's part. Gunner then moved for summary judgment as to each of GM's counts.

## Discussion

### Summary Judgment Standard

Fed.R.Civ.P. 56 provides the statutory basis for summary judgment, and is made applicable to adversary proceedings via Fed.R.Bankr.P. 7056. "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Kalamazoo River Study Group v. Rockwell Intern. Corp., 171 F.3d 1065, 1068 (6th Cir. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." Id. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis original). "There is no genuine issue of material fact when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Williams v. Leatherwood, 258 Fed. Appx. 817, 820 (6th Cir. 2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Initial Issues

Gunner initially alleges that the named Plaintiff, General Motors, LLC, has not proven it is the proper holder of the claim, which was originally asserted by or belonged to General Motors Corporation. Gunner essentially argues that GM lacks standing to bring this complaint as a result of General Motors Corporation's bankruptcy reorganization. As noted in this Court's prior opinion denying GM's motion for summary judgment, collateral estoppel bars Gunner from relitigating here the standing issue because that particular issue was actually and necessarily litigated in the State Court. This Court sees no reason to alter that previous conclusion.

Gunner next argues that any wrongdoing or liability was solely that of Jonner Steel and he should not be held personally responsible for such because only Jonner Steel accepted and kept the overpayments. Even if that is true, it cannot be said as a matter of law that Gunner is insulated from personal liability. The State Court found both he and Jonner Steel converted the overpayment sums, apparently relying on Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc., 444 N.W.2d 210, 213 (Mich. App. 1989) ("When conversion is committed by a corporation, the agents and officers of the corporation may also be found personally liable for their active participation in the tort, even though they do not personally benefit thereby."). At the very least, the final State Court ruling and factual conclusions supporting it are sufficient to raise a genuine issue of material fact as to Gunner's personal liability to GM on the alleged counts.

## § 523(a)(2)(A)

Under this provision, a debtor shall not be discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" As this statute is phrased in the disjunctive, it contains three separate (albeit nuanced) grounds for nondischargeability. Rakich v. Jagiello, 2013 WL 4068166 at *5, 8 (Bankr. E.D. Mich. 2013) (citations omitted). "'False pretenses' for purposes of Section 523(a)(2)(A) then may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective." Id. at *7 (quoting In re Kovler, 249 B.R. 238, 261 (Bankr. S.D. N.Y. 2000)). It requires a showing of reliance, materiality, and intent. In re Hermoyian, 466 B.R. 348, 379 (Bankr. E.D. Mich. 2012) (quoting In re Oxford, 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010)). "False representation" requires proof that:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

In re Grenier, 458 Fed. Appx. 436, 438 (6th Cir. 2012) (quoting In re Rembert, 141 F.3d 277, 280–81 (6th Cir. 1998)). Actual fraud, which is broader than misrepresentation, requires a showing of (1) a course of conduct intended to deceive; (2) justifiable reliance; and (3) proximate causation. In re Vitanovich, 259 B.R. 873, 877 (Bankr. App. 6th Cir. 2001); Rakich v. Jagiello, 2013 WL 4068166 at *6 (citations omitted).

6

Gunner argues that GM cannot prove a § 523(a)(2)(A) violation because (a) Jonner Steel and Gunner always submitted true and accurate invoices; (b) Jonner Steel and Gunner did not become aware of the overpayments until after they were made; (c) neither Jonner Steel nor Gunner had a duty to disclose to GM the overpayments GM made; (d) GM knew or could have easily have known all the facts necessary to pay the correct amounts, thus negating GM's necessary showing of reliance; and (e) GM cannot prove Gunner's intent to deceive. GM counters by arguing that a § 523(a)(2)(A) violation resulted from Gunner's failure to fulfill a duty to disclose, which arose out of the doctrine of unjust enrichment. This Court has previously discussed the governing law as follows:

> As to so-called "silent" fraud, the rule generally is that silence alone is not enough, but in addition there must exist a violation of some duty to disclose, arising for example, from a fiduciary relationship, or possibly in rare cases where special facts and circumstances give rise to an equitable duty of disclosure such as might, along with other facts, be involved in a situation where one party has superior knowledge that is not within the fair and reasonable reach of (or could not in the exercise of reasonable diligence be obtained by) the other party to the transaction.

Matter of Phillips, 153 B.R. 758, 761 (Bankr. E.D. Mich. 1993). "A duty to disclose may also arise in equity. Most cases that provide for an equitable duty to disclose under the silent fraud doctrine address circumstances where one party has superior knowledge that is not easily accessible to the other party by the exercise of due diligence." In re Sterling, 479 B.R. 444, 450 (Bankr. E.D. Mich. 2012) (citing U.S. Fid. & Guar. Co. v. Black, 412 Mich. 99, 125 (1981) and Hand v. Dayton–Hudson, 775 F.2d 757, 759 (6th Cir.1985)).

The undisputed relevant factual context in this regard is that (a) Jonner Steel's invoices to GM were correct or sufficiently clear on their face that they were billed in pounds and correctly

reflected the agreement between the parties; (b) due to internal mistakes made by GM and/or its agents in the form of unnecessary conversions from pounds to kilograms, GM commenced making overpayments on invoices submitted by Jonner Steel in the same per-pound form as they had been previously submitted and correctly paid by GM; and (c) GM itself, or as a result of the information supplied to it, thereafter discovered its mistaken overpayments and took steps to set-off and minimize the amounts thereof, with it appearing that Jonner Steel did not contest such set-offs. The overpayments were thus directly traceable to GM's unilateral and affirmative mistakes, which would have been both discoverable and correctable had GM taken the minimal time and effort to check its own previous payments and records. Those facts do not, as a matter of law, permit a conclusion that any equitable duty of disclosure by Jonner Steel arose by way of one party possessing superior knowledge or information not reasonably or fairly attainable by the other party. Rather, both Jonner Steel and GM were commercial actors and, arguably, GM was the more sophisticated of the two. The level of diligence and investigation needed by GM to discover these facts was extremely cursory. The fact that GM was overpaying was as obvious to it as it was obvious to Jonner Steel and Gunner. Reinforcing that conclusion is GM's inability to prove the required element of justifiable reliance. GM essentially argues that it relied on Jonner Steel and Gunner's failure to bring the overpayments to its attention. GM did not justifiably rely on that silence, and even if it had, that reliance would not have been the proximate cause of GM's injury. Accordingly, as a matter of law, GM can prove no set of facts to support its § 523(a)(2)(A) claims and Gunner is entitled to summary judgment on that count.

8

## § 523(a)(4)

Under this provision, a debtor shall not be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." GM's complaint alleges a § 523(a)(4) count only as to embezzlement. "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." In re Stollman, 404 B.R. 244, 271 (Bankr. E.D. Mich. 2009) (quoting Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th Cir. 1996)). Gunner disagrees with both GM's allegation that the circumstances indicate fraud that the overpayments were "entrusted" to him or to Jonner Steel. Gunner argues that GM paid the sums for the purpose of compensating Jonner Steel (albeit in excess amounts) for goods tendered and that those sums were not appropriated for any purpose other than which they were intended because GM did not instruct any specific use for the money. Gunner also argues that such payments were maintained pursuant to the lockbox arrangement and then applied as a credit to GM's account (the implication being that such outstanding credits could not be satisfied because Jonner Steel became defunct and without assets). GM argues that the overpayments were initially obtained lawfully by Jonner Steel and Gunner, but separate fraudulent appropriations occurred (a) when Jonner Steel and Gunner identified the excess payments; and (b) when Jonner Steel and Gunner refused GM's later demands to return those sums. GM views those overpayments as having benefitted Gunner individually by adding value to and/or reducing the liabilities of Jonner Steel, of which he was a majority owner.

9

GM did not "entrust" the overpayments to Jonner Steel or to Gunner. As noted, GM voluntarily but improperly overpaid Jonner Steel and was unable to recoup some of those overpayments, at least in part because of Jonner Steel and Gunner's refusal to return them. The State Court deemed this to be conversion, even though the money had originally come lawfully into Jonner Steel's control. Black's Law Dictionary (9th ed. 2009) defines "entrust" to mean giving another responsibility for something, usually after establishing a confidential relationship. It cannot be said that by making the overpayments to Jonner Steel, GM "entrusted" such sums for any specific purpose. "The question of entrustment or lawful possession of property depends on whether the facts indicate something more than a mere debtor-creditor relationship[.]" In re Kichler, 226 B.R. 910, 914 (Bankr. D. Kan. 1998).

Two cases shed some light on the entrustment requirement. In In re Metzger, 442 B.R. 121 (Bankr. S.D. Ohio 2010), the plaintiff was the title company in a home mortgage refinance transaction and subsequently brought a nondischargeability action against the defendant-homeowner, including a count of embezzlement. The plaintiff conceded that the defendant was entitled to a check in a certain amount for the net proceeds of the transaction. However, the plaintiff mistakenly issued a check to the defendant for over three times than what the plaintiff should have issued. When the defendant's husband inquired to verify that the check was in the correct amount, the plaintiff reassured him that it was. Later, however, the plaintiff asserted that this large check was instead intended to be signed by the defendant and returned to the plaintiff so that it could be applied to the new first mortgage. The Court found that the overpayment was not "entrusted" to the defendant or her husband because the plaintiff voluntarily surrendered the funds. The Court stated:

10

> there were no strings attached, that would cause the Court to find that the funds
> were entrusted in any sense to the Defendant for an agreed upon purpose. In
> addition, there is no basis for this Court to find that there was an unlawful taking
> of property, since the check was freely given to the Defendant, and the Plaintiff
> waited approximately thirteen months to discover and seek to rectify the alleged
> error.

Id. at 125. Similarly, in In re Algire, 430 B.R. 817 (Bankr. S.D. Ohio 2010), the plaintiff issued a business loan to the defendant's company, which the defendant personally guaranteed. The plaintiff argued that the defendant should not be discharged for his indebtedness on the guarantee because he allegedly violated the agreement by using loan proceeds for his personal benefit. The Court held that by issuing the loan, the plaintiff did not "entrust" the money to either the defendant or his company. It viewed the plaintiff as having voluntarily transferred control of and access to the funds, giving the defendant almost absolute discretion over their use.

Further, it cannot be said that the overpayments were appropriated for a purpose other than that for which GM intended. GM surrendered control of the overpayments intending to give Jonner Steel lawful permanent possession because GM genuinely but mistakenly believed Jonner Steel was entitled to such. Lastly, GM is unable to prove that the circumstances indicate fraud because, as previously noted, it cannot prove justifiable reliance, which is a necessary element of fraud. See Matter of Pauley, 205 B.R. 501, 515 (Bankr. W.D. Mich. 1997) (total lack of evidence concerning reliance, which precluded a finding of actual fraud under § 523(a)(2)(A), also precluded finding that the circumstances indicated fraud as required by § 523(a)(4)). Gunner's motion for summary judgment is granted with regard to GM's § 523(a)(4) claim for embezzlement.

11

## § 523(a)(6)

Under this provision, a debtor shall not be discharged from any debt for willful and malicious injury to another. The terms "willful" and "malicious" are distinct and separate concepts. In re Martin, 321 B.R. 437, 440 (Bankr. N.D. Ohio 2004). The injury must have been willful, not just the act giving rise to injury. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). The term willful means a deliberate or intentional injury. Id.; In re Little, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005). To establish that a defendant "willfully" injured it, a plaintiff must show that the defendant either acted with an actual intent to cause the alleged injury or a belief that the alleged injury was substantially certain to result from his act. See Phillips v. Weissert (In re Phillips), 434 B.R. 475, 483 (B.A.P. 6th Cir. 2010) (citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463 (6th Cir. 1999)). "The term malicious is defined as conduct taken in conscious disregard of one's duties or without just cause or excuse." In re Little, 335 B.R. at 383-84 (quoting Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986)).

Gunner argues he is entitled to summary judgment on this count because (a) the alleged injury occurred because of GM's own mistakes; (b) neither Jonner Steel nor Gunner could have prospectively anticipated that GM would make overpayments; and (c) the conduct was, at most, a failure to pay a debt, which cannot be a basis for a willful and malicious injury. GM argues that Jonner Steel and Gunner inflicted a willful and malicious injury by identifying and thereafter retaining the overpayments. What is alleged here is more than mere failure to pay a debt. The State Court found that Gunner converted property and GM now contends that such conduct inflicted a willful and malicious injury on it. GM's allegation does not relate to failing to pay a debt, but rather to the manner in which that debt was incurred, i.e. what Gunner knew and

12

intended when he converted the sums. Under Michigan law, "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness [sic] or malice." Tudryck v. Mutch, 30 N.W.2d 512, 516 (Mich. 1948) (quoting Davis v. Aetna Acceptance Co., 293 U.S. 328, 332 (1934). There exist genuine issues of fact as to such.[1] Gunner's motion for summary judgment is denied as to § 523(a)(6).

§ 727(a)(2)

GM alleged violations of both subsections of § 727(a)(2), which states:

(a) The court shall grant the debtor a discharge, unless—

\*\*\*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition[.]

GM alleges two violations of that provision: (a) Gunner's concealment of the GM overpayments; and (b) after Jonner Steel ceased to operate, Gunner's manipulation of his salaries in order to hide his assets and insulate himself from GM's collections efforts.

First, GM alleged that Gunner continuingly concealed these overpayment sums, perhaps by transferring them to Heythaler, who as noted was his girlfriend and an employee of Jonner Steel. Gunner argues that all such sums were not paid to him personally, but rather were paid to

---

[1] However, given the facts presented, the inquiry of § 523(a)(6) is sufficiently distinct from that

13

Jonner Steel via the lockbox arrangement whereby those sums were applied to Bank of America's loan. Thus, Gunner alleges such overpayments were never his own property or property of his bankruptcy estate. At most, he argues, the retention of those overpayment sums had an incidental benefit to the value of a corporation in which he held stock. It is uncontested that GM's overpayment sums went to Jonner Steel. Importantly, GM does not allege that Gunner personally obtained the overpayment sums. The State Court found that Jonner Steel committed conversion by failing to repay the sums and that Gunner was jointly and severally liable because he controlled the corporation but refused to remedy the effects of its tort, despite his ability to do so. Any benefit to Gunner would be because of Jonner Steel's subsequent increase in assets and/or reduction in liabilities. "[A] corporation has a separate legal existence from its shareholders, and the corporation, not its shareholders, owns the corporate assets." In re Hopkins, 2012 WL 423916 n.2 (Bankr. W.D. Mich. 2012) (citing Hollins v. Brierfield Coal & Iron Co., 150 U.S. 371, 383 (1893) and Flint Cold Storage v. Dep't. of Treas., 776 N.W.2d 387, 397 (Mich. App. 2009)). If indeed Jonner Steel wrongfully received money from GM and that money stayed within Jonner Steel's control, Gunner would have no direct proprietary interest in that money. See In re Scott, 462 B.R. 735, 742 (Bankr. D. Alaska 2011); In re Thurman, 901 F.2d 839, 841 (10th Cir. 1990); In re Kandel, 2013 WL 310302 *3 (Bankr. N.D. Ohio 2013). As a result, the overpayment sums were never "property of the debtor" or "property of the estate" and Gunner is entitled to summary judgment as to the § 727(a)(2) claim as relates to the overpayment sums.

---

of § 523(a)(2)(A), which warrants denying summary judgment as to the former but not the latter.

14

10-07685-wsd    Doc 81    Filed 12/10/13    Entered 12/10/13 13:11:03    Page 14 of 17

Second, GM alleges that, after Jonner Steel was liquidated and dissolved, Gunner engaged in a fraudulent scheme whereby he began working for another steel company called St. Clair Metal Sales, Inc. ("SCMS"), apparently using his industry contacts from Jonner Steel. SCMS was formed about six months after Jonner Steel stopped operating. Heythaler is alleged to be SCMS's sole stockholder and sole officer. GM alleges that Gunner used his employment with SCMS to funnel his sales earnings to Heythaler and keep them out of reach of GM's collection efforts because (a) Gunner was the driving force behind SCMS's sales income; (b) Gunner received a suspiciously low salary; and (c) Heythaler received a bulk of the SCMS income despite her lack of steel sales experience. GM alleged that Heythaler would then use this money to pay the shared living of Gunner and herself, thereby benefitting Gunner. In support of this theory that Gunner artificially and fraudulently depressed his salary at SCMS, GM argues that after Gunner left SCMS around 2010, he took employment with another steel company, doing comparable work but earning more than three times as much because his salary was no longer being manipulated. GM characterizes this allegation as "the gravamen" of its § 727(a)(2) claim.

Gunner argues that summary judgment on this count is warranted because this specific allegation is not alleged in GM's complaint. The § 727(a)(2) count in the complaint only specifically listed one asset alleged to have been concealed: the overpayment sums. But it also stated that the count was not limited to such and that GM's investigation and discovery remain ongoing. Comp. at ¶ 55-57. Reading the face of the complaint and making reasonable inferences, this Court disagrees with Gunner on this argument. This conclusion is reinforced by the parties' stipulated discovery plan, which appears to indicate that the SCMS issue was

15

contemplated at the outset of this adversary proceeding. Report of Parties' Rule 26(f) Conference, Dkt. 9, pg. 2. As to the merits, Gunner argues that summary judgment is appropriate because he did not transfer any assets to Heythaler other than their shared living expenses and that all such transfers were disclosed on his bankruptcy schedules. Gunner argues he was legitimately employed by SCMS, that it compensated him accordingly, and that GM cannot point to any specific facts to support its allegations. These respective arguments raise genuine issues of material fact as to this alleged concealment scheme. Accordingly, Gunner's motion for summary judgment is denied with respect to it.

To some degree, it appears that GM also alleges that Gunner misappropriated his steel industry contacts after Jonner Steel ceased operating and that such may also constitute a § 727(a)(2) violation. Such an argument is without merit. Gunner was free to subsequently take employment with or ownership in other steel industry firms. It cannot be said that he concealed such contacts or relationships because there is no proof of a legal or contractual obligation that he refrain from transferring or using such. Similarly, GM has no cause of action for Gunner's alleged misappropriation of Jonner Steel's former customers. GM's § 727(a)(2) count survives summary judgment only with regard to the above-referenced alleged salary manipulation scheme via SCMS.

## CONCLUSION

For the foregoing reasons, Gunner's motion for summary judgment is granted in part and denied in part. Gunner shall, under the applicable local rule, present an appropriate order. After the entry of that order, the Court will be issuing a scheduling order.

**Signed on December 10, 2013**

                                                           /s/ Walter Shapero
                                       Walter Shapero
                                       United States Bankruptcy Judge